# EXHIBIT 1

**E. Michael Robie, D.O.**
**Vice President for Ambulatory Services**
**Charleston Area Medical Center, Inc.**
**501 Morris Street**
**Charleston, West Virginia 25301**

March 26, 2024

Jason Barton, D.O.
1212 Garfield Avenue, Suite 202
Parkersburg, West Virginia 26101

RE:     Terms of Employment with Charleston Area Medical Center, Inc. (the "Agreement")

Dear Dr. Barton:

Charleston Area Medical Center, Inc. ("CAMC") is pleased to offer you employment on the following terms and conditions:

1.      You will be employed on a full-time (1.0 FTE) basis to provide professional family practice services (the "Specialty") for CAMC patients, beginning no later than five (5) business days following the date CAMC receives a final, non-appealable certificate of need, exemption from certificate of need review, or determination of non-reviewability from the West Virginia Health Care Authority to acquire substantially all of the assets of Pars Neurosurgical Associates, Inc., a West Virginia medical corporation doing business as PARS Healthcare (the "Employment Commencement Date").  You will report to the Vice President for Ambulatory Services (the "Vice President") or designee with respect to administrative matters and to the Chief Medical Officer or designee with respect to clinical matters.  You agree to work at 1212 Garfield Avenue, Suite 202, Parkersburg, West Virginia 26101, or any location reasonably requested by CAMC.  CAMC agrees your work commitment may be satisfied through a four-day, ten-hour work week.  You shall perform the duties set forth in the position description attached hereto and incorporated herein as Exhibit A.





3.      During each employment year, you will be eligible for a WRVU Production Bonus (the "WRVU Production Bonus") equal to the number of WRVUs personally performed by you in excess of 7,000 (the "WRVU Threshold"), multiplied by $50.00. Your annual WRVU Production Bonus will be estimated quarterly and reconciled after each employment year.  Payments will be made in the following manner:

(a)      On a quarterly basis during each employment year, your actual productivity shall be compared to one quarter of the WRVU Threshold, or 1,750 WRVUs (the "Quarterly Target").

(b)      If the actual WRVUs produced in a quarter exceed the Quarterly Target, WRVUs in excess of the Quarterly Target shall be multiplied by $50.00 and multiplied by seventy-five percent to determine the quarterly payment. Any quarterly payment will be made within sixty (60) days following the end of the applicable quarter. If your actual WRVUs produced in a quarter are less than the Quarterly Target, the deficit will be carried forward to future quarters within the same employment year and reconciled annually.

(c)      Within ninety (90) days of the end of each employment year, an annual reconciliation will be performed and you will be paid the net amount of any WRVU Production Bonus due, if any.  If you have been overpaid, you agree to repay the amount of any overpayment within thirty (30) days of notice from CAMC.  In the alternative, CAMC may elect to deduct such amounts from future payments due under this Agreement. Such deduction will be accomplished by an assignment of wages and by signing your name below, you agree, in the event of such overpayment, to execute a valid wage assignment, in such form as desired by CAMC, immediately upon request by CAMC.

4.      You will also be paid One Thousand Dollars and No Cents ($1,000.00) per month for supervising advanced practice professionals ("APPs") employed by CAMC in the Specialty ("Supervision Stipend" ). Taxes will be withheld from said Supervision Stipend.

You expressly acknowledge and agree that CAMC is making the Sign-On Payment solely to induce you to use your skills, knowledge and training as a full-time employee of CAMC in your Specialty for three years.  CAMC is not willing to extend the Sign-On Payment to you without your good faith

commitment to commence employment on or before the Employment Commencement Date and be employed by CAMC on a full-time basis in the Specialty for the entire three year period.  As an inducement to CAMC to extend the Sign-On Payment, you expressly represent that you will commence employment on or before the Employment Commencement Date and will continually be employed by CAMC on a full-time basis in the Specialty for the entire three year period.  Should you fail for any reason (other than if you are unable to perform your obligations hereunder as a result of your death or permanent disability) to remain employed by CAMC on a full-time basis in the Specialty for the entire three year period, you will repay CAMC the entire amount of the Sign-On Payment.  Repayment shall be made within thirty (30) days.  You agree that you will be responsible for any of CAMC's costs of collection, including but not limited to attorney fees and/or collection costs, should CAMC be required to initiate collection efforts to obtain payment of an unearned Sign-On Payment.  You shall be liable for such collection costs whether or not any lawsuit or formal legal proceeding is actually commenced.  Your obligation under this Section shall survive the expiration or termination of your employment.

6.      The compensation paid to you constitutes fair market value compensation for the services you provide to CAMC.  You shall receive no more than reasonable, fair market value compensation for the services you provide and no portion of the amounts provided herein will be used in any manner that constitutes private inurement or the conferring of an impermissible private benefit by a tax-exempt organization.  Your compensation does not and will not take into account the volume or value of any referrals or other business generated by you.

8.      You will be entitled to CAMC's employee benefit package for full-time employment, with eligibility to be determined in accordance with the terms of CAMC's employee benefit plans, except that you will not be eligible to participate in the following: (1) Paid Time Off ("PTO"); (2) CAMC's Achievement Sharing Plan; or (3) any bonus programs not otherwise specifically set forth herein.

9.      You will receive an allowance of up to Two Thousand Dollars and No Cents ($2,000.00) per year for dues, subscriptions to professional publications, license fees and professional books.  You will receive up to five (5) days off work and payment or reimbursement of expenses of up to Three Thousand Dollars and No Cents ($3,000.00) per year to attend continuing medical education, medical conferences and other meetings.  Specific expenditures of money and time shall be subject to budgetary limitations and to the prior approval of the Vice President.  Travel expenses shall be paid or reimbursed in accordance with CAMC's travel policy.

10.     You will receive up to thirty (30) days off work for holidays, vacation, personal days and sick days.

11.     You must schedule all holidays, vacation, personal days, continuing medical education, and all other absences in consultation with the Vice President to minimize the disruption of Specialty services at CAMC and you shall be responsible for arranging coverage for your duties in advance of any absence.

Unused days off may not be carried forward into any subsequent employment year.  You will not be paid or otherwise compensated for any unused days off upon cessation of your employment, regardless of the reason for such cessation.

12.      In exchange for all these benefits, and as a condition of your continued employment with CAMC, you will, for so long as you are employed by CAMC:

     A.      Maintain unrestricted appointment to the active Medical Staff of CAMC and comply with CAMC's bylaws and Medical Staff governing documents;

     B.      Maintain unrestricted participation in Medicare, Medicaid and other governmental and third-party payer programs requested by CAMC;

     C.      Obtain and maintain board certification as required by CAMC's Medical Staff governing documents;

     D.      Maintain professional liability insurance and cooperate with CAMC in the prosecution or defense of any claim, investigation, litigation or proceeding, all as set forth in <u>Exhibit B</u>;

     E.      Abide by the intellectual property policies attached hereto as <u>Exhibit C</u>;

     F.      Participate in CAMC's performance improvement and quality assurance initiatives;

     G.      Provide or participate in in-service or other educational programs for medical students, interns, residents, fellows, or other health care personnel as requested by CAMC;

     H.      Actively participate in and support electronic medical record and other technology systems and programs adopted by CAMC;

     I.      Accept all patients referred to you by CAMC and not discriminate in the care and treatment of CAMC patients or patients seeking treatment at CAMC on the basis of race, creed, color, national origin, age, sex, gender, sexual orientation, gender expression and gender identity, religion, veteran status, handicap, place of residence, health status, ability to pay, source of payment or participation in a particular payor's plan or a patient's status as a beneficiary of a federal health care program.

     J.      Follow all applicable laws and all policies and procedures of CAMC and its Medical Staff;

     K.      Keep and maintain timely, complete, and appropriate medical, time, financial, and other records relating to all professional services rendered by you, as required by (i) CAMC's policies, (ii) accreditation standards, (iii) guidelines, rules and regulations of the American Medical Association or the American Osteopathic Association, and (iv) guidelines, rules and regulations of Medicare, Medicaid, and other federal, state and other third-party payer programs;

     L.      Abide with applicable law, the national standard of care and accepted methods of practice and the principles of medical ethics of the American Medical Association or the American Osteopathic Association, as appropriate;

M.      Comply with and assist CAMC achieve applicable accreditation standards, including those standards that support the principles of risk reduction, patient safety, quality of care and performance improvement;

N.      Notify CAMC within twenty-four (24) hours of your receipt of any of the following: (a) notice of any changes in your professional liability insurance coverage; (b) notice of any claim or litigation alleged or instituted against you; (b) notice of any audit, investigation, or other inquiry of you or action against you by any governmental or regulatory authority, licensing, or accrediting body; (c) notice that you have been or may be debarred, suspended, or excluded from participation in or otherwise sanctioned by Medicare, Medicaid, or any other governmental or third-party payor program; and (d) notice that your Medical Staff appointment or clinical privileges at any facility have been or may be restricted, limited, suspended or revoked.

O.      Assist CAMC, as reasonably requested, in achieving all requirements of certifications, accreditations and designations held or desired by CAMC.

13.     CAMC will not control or unduly influence the exercise of your judgment, discretion, or practice with respect to activities that constitute the practice of medicine.  Medical professional decisions arising out of the performance of your duties on behalf of CAMC shall be made only by you or by other persons properly qualified and licensed to practice medicine in West Virginia.

14.     In the event of the termination of this Agreement or your employment hereunder for any reason, you agree to take all steps necessary for CAMC to effect an orderly transfer of patient records and information to another CAMC-employed physician.  Such steps include, but are not limited to:

A.      assisting with the transfer of patient records to another CAMC-employed physician;
B.      refraining from soliciting patients;
C.      refraining from sending announcements or publications regarding new offices or employment affiliations to patients;
D.      refraining from taking, copying, or distributing in any way lists of patients; and
E.      refraining, for a period of two (2) years after the expiration or early termination of this Agreement, from soliciting, recruiting, engaging, or employing any individual who was employed or engaged by CAMC or its affiliates in any capacity during the term of this Agreement.

All medical records and related files concerning patients, including, without limitation, patients consulted, interviewed, treated, and cared for by you during your employment by CAMC; all property furnished by CAMC hereunder; and all tangible work product including but not limited to all records, reports, correspondence, articles, studies, and results of all research conducted by you hereunder, or under your supervision, shall be and remain the property of CAMC.  You shall divest yourself completely of, and return to CAMC, all CAMC property acquired during the Initial Term and all renewals of this Agreement upon the termination of this Agreement, including the proceeds of all grants and the results of all research which may have been conducted pursuant to your employment, regardless of whether or not the same has been completed.  Your obligations under this Section shall survive the expiration or termination of this Agreement.

15.     For so long as you are employed by CAMC, you will work exclusively for CAMC and will not, without CAMC's advance written consent, engage in any outside professional activities or otherwise compete with any of the lawful activities of CAMC.  You must send a copy of any written approval for

outside activities to the Vice President and to CAMC's Human Resources Department.  No approval will be granted for any activity which uses the names, logos, or descriptions of CAMC or any CAMC affiliate in connection with the promotion or endorsement of any commercially marketed product or service. CAMC shall not provide professional liability coverage for any activities outside the scope of your employment by CAMC, whether or not such outside activity is approved by CAMC as provided in this section.

16.      For one (1) year following the expiration of this Agreement or termination of this Agreement by you, you will not work in any professional medical or administrative capacity within a thirty (30) road mile radius of the CAMC location to which you are primarily assigned; provided however, that nothing contained in this section shall prevent you from engaging in the private, independent practice of medicine following termination of this agreement by you.  For purposes of this Agreement, "private, independent practice of medicine" shall include only your own independent (solo) practice or your practice with any one or more of the physicians employed by PARS Healthcare on the day prior to the Employment Commencement Date.

17.      CAMC shall have the right to use your name, photograph, likeness, and professional credentials to promote CAMC or any affiliate, and you hereby expressly consent to CAMC's and any affiliates' use of the same for such purposes without additional compensation.  You shall not market or advertise yourself, CAMC or any affiliate and abide by the mandatory review process of CAMC for all advertisement, marketing materials, and specialty items intended for distribution or display on behalf of CAMC or any affiliate.

18.      This Agreement shall be for an initial term of three (3) years beginning the Employment Commencement Date (the "Initial Term").  Upon expiration of the Initial Term, this Agreement shall be automatically renewed on the terms hereof for successive one-year terms, unless otherwise terminated in the manner set forth herein.  Your employment with CAMC is at-will and may be terminated by you or by CAMC at any time, with or without cause, upon ninety (90) days advance written notice.  Unless otherwise agreed by CAMC in advance, your Medical Staff appointment and clinical privileges at CAMC will terminate automatically upon the termination of your employment.  The provisions of CAMC's Medical Staff governing documents relating to hearings and appeals will not apply to you with respect to matters relating to your employment or the termination of your employment and the coterminous termination of your Medical Staff appointment and clinical privileges at CAMC.

19.      The Deficit Reduction Act of 2005 requires CAMC to inform all employees, contractors, and their agents of the following: CAMC receives reimbursement for many of its services from the Medicare and Medicaid programs.  Under the federal False Claims Act and West Virginia laws, any person who knowingly submits, or causes someone else to submit, illegal claims for payment of government funds is subject to government fines and penalties.  CAMC is committed to abide by these laws, and relies on employees, contractors, and their agents to identify and report potential problems.  Reports of suspected illegal claim activity may be made to any member of CAMC administration or the CAMC Office of Corporate Compliance or by calling the confidential Compliance Hotline at 1-877-777-0787.  Reports may also be made to the United States Department of Health and Human Services Office of Inspector General or the West Virginia Department of Health and Human Resources Office of Inspector General. Those who report questionable practices are protected from retaliation for reports made in good faith by federal and state laws and by CAMC policy.

20.    CAMC and you agree that the electronic signatures, whether digital or encrypted, of the parties included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures.    Electronic Signature means any electronic sound, symbol, or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including but not limited to facsimile or email electronic signatures, pursuant to the West Virginia Uniform Electronic Transaction Act (W.Va. Code §39A-1 *et. seq.*) as amended from time to time.

It is understood and agreed that your employment with CAMC under this Agreement is contingent upon the following: (a) CAMC's receipt of necessary corporate and regulatory approvals, including a certificate of need, exemption from certificate of need review, determination of non-reviewability or other approval required from the West Virginia Health Care Authority to acquire PARS Healthcare; and (b) execution and delivery of all documents necessary or desirable to consummate the transactions associated with CAMC's acquisition of PARS Healthcare, including, but not limited to, leases for PARS Healthcare's existing office space, the Asset Purchase Agreement and related bills of sale and assignment, all on terms satisfactory to you and CAMC.

Please acknowledge your acceptance and agreement to these terms of employment by affixing your signature below and returning one fully executed original to me.

Sincerely,

E. Michael Robie, D.O.
Vice President for Ambulatory Services
Charleston Area Medical Center, Inc.

ACCEPTED AND AGREED:

Jason Barton, D.O.

Date: 4/25/24

<u>Exhibit A</u>

<u>Physician Job Description</u>

**Job Title**: Physician

**Summary**: Under indirect supervision, provides and manages direct health care for a specified patient population.

**Duties and Responsibilities**:

1. Provides and manages direct patient care, including physical examinations, evaluations, assessments, diagnoses, and treatment for a specified patient population.

2. Prescribes pharmaceuticals, other medications, and treatment regimens as appropriate to assessed medical conditions.

3. Refers patients to specialists and to relevant patient care components as appropriate.

4. Trains and supervises medical students and residents engaged in specialty activities and procedures, as appropriate.

5. May manage the daily operations of a specific medical program, patient care unit, or research function.

6. Directs and coordinates the patient care activities of nursing and support staff as required.

7. Follows established departmental policies, procedures, and objectives, continuous quality improvement objectives, and safety, environmental, and/or infection control standards.

8. As appropriate to the position, participates in specified health promotion, education and/or prevention programs.

9. Performs miscellaneous job-related duties as assigned.

**Minimum Job Requirements**:

Medical doctor with 3 to 5 years of directly related experience which may include residency in a directly related medical specialty.

Federal DEA Certification; Medical Specialty License or Certification; Board certified or Board Eligible in Specified Area of Medical Specialty.

**Knowledge, Skills and Abilities Required**:

• Ability to observe, assess, and record symptoms, reactions, and progress.

• Knowledge of legal and ethical standards for the delivery of medical care.

{00358620.DOCX;2 }                                    8

- Knowledge of relevant drugs and non-pharmaceutical patient care aids and ability to prescribe dosages and instruct patients in correct usage.

- Ability to maintain quality, safety, and/or infection control standards.

- Knowledge of community medical diagnostic and patient care services in area of medical expertise.

- Knowledge of related accreditation and certification requirements.

- Knowledge of current principles, methods, and procedures for the delivery of medical evaluation, diagnosis, and treatment in area of expertise.

- Ability to work both independently and in a team environment.

- Effective verbal and written communication skills.

- Ability to supervise, advice, and train clinical professionals and/or students in area of expertise.

- Ability to develop and present educational programs and/or workshops.

**Conditions of Employment**:

- Successful candidate must submit to post offer, pre-employment physical examination/medical history check.

- CPR Certified

- Pre-employment background investigation may be required.

**Working Conditions and Physical Effort**:

- Work involves considerable exposure to unusual elements, such as extreme temperatures, dirt, dust, fumes, smoke, unpleasant odors, and/or loud noises.

- Moderate physical activity. Requires handling of average-weight objects up to 25 pounds or standing and/or walking for more than four (4) hours per day.

- Work environment involves exposure to potentially dangerous materials and situations that require following extensive safety precautions and may include the use of protective equipment.

- Will work with blood or blood-borne pathogens and will require OSHA training

<u>EXHIBIT B- CONTINUE PHYSICIAN'S EXISTING PROFESSIONAL LIABILITY INSURANCE</u>

(a)     Throughout the Term of this Agreement, you shall consistently maintain in full force and effect commercial professional liability insurance with limits of liability of $1,000,000 per occurrence and $3,000,000 annual aggregate or such greater amounts and in such form as may from time to time be required by CAMC's policies with respect to Medical Staff professional liability insurance, covering you against any claim or claims for damages or other relief arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of your duties in the scope of your employment hereunder (except for "Excluded Services" as hereinafter defined).  You shall keep CAMC furnished with a current certificate of insurance or other valid documentation of the coverage required hereunder and by CAMC's policies, which certificate or other documentation shall state that you shall notify CAMC at least thirty (30) days prior to any amendment, modification, limitation, cancellation, expiration, loss, or other impending lapse of coverage.  The issuing insurance carrier shall be an admitted carrier in the State of West Virginia or a state-authorized carrier.  If you provide the foregoing insurance pursuant to a policy written on a claims-made basis and such policy is terminated for any reason other than pursuant to Section (d) below, you shall be responsible, at your sole cost and expense, for procuring and maintaining an unlimited extension of coverage, commonly known as a reporting endorsement or tail coverage, which will apply to an incident, claim, action, cause of action or event which occurred during the pendency of the claims-made coverage but is reported after such policy's termination date. The requirement that you maintain comprehensive professional liability coverage, including tail coverage, and provide proof of the same shall survive the termination or expiration of this Agreement.

(b)     Throughout the Term of this Agreement, CAMC shall reimburse you for the actual cost of the annual premium (but not any tail premium) associated with the insurance required by Section (a) above.  Responsibility for payment of premiums for any partial Employment Year shall be pro-rated between CAMC and you.  You shall ensure that CAMC is named as an additional insured on such policy.

(c)     If any of your duties and obligations performed during the Term and within the scope of your employment pursuant to this Agreement are outside the scope of coverage of your professional liability insurance coverage (the "Excluded Services"), then with respect to such Excluded Services, CAMC shall cause to be maintained on behalf of and at no cost to you, the professional liability insurance described in this Exhibit B.

(d)     If CAMC determines, in its sole discretion, that it is in CAMC's best financial interest for you to terminate your existing insurance coverage and replace such coverage with other commercial professional liability insurance coverage, or with coverage through any CAMC program of self-insurance (a "Change in Coverage"), then CAMC may request that you make a Change in Coverage, and if such Change in Coverage is made as requested by CAMC, then CAMC will, at its sole cost and expense, procure and maintain an extension of coverage, commonly known as a reporting endorsement or tail coverage, which will apply to an incident, claim, action, cause of action or event which occurred during the pendency of the claims-made coverage but is reported after such policy's termination date.  CAMC will have no obligation to initiate or accept any Change in Coverage.

(e)      During and following your employment with CAMC, you shall fully cooperate with CAMC in the prosecution or defense of any claim, investigation, litigation or proceeding that, in CAMC's sole discretion, requires your participation, including, but not limited to, matters that directly involve care given by you as well as matters where you are is needed as a witness.  Without limiting the generality of the foregoing, you shall:

(1)      provide CAMC with all information, assistance and cooperation that CAMC reasonably requests in connection with such claim, investigation, litigation or proceeding;

(2)      assist CAMC, as requested, in investigating, prosecuting, defending, litigating, settling, or otherwise resolving any claim, investigation, litigation, or proceeding;

(3)      assist CAMC, as requested, in enforcing any right of contribution or indemnity against a third-party who may be liable to CAMC; and

(4)      participate, as requested, in the conduct of actions, suits, appeals, or other proceedings, including, but not limited to, attending trials, hearings, interviews, depositions, conferences or meetings; securing and giving evidence; and identifying and obtaining the attendance of witnesses.

(f)      During and following your employment with CAMC, you also must: (i) immediately send CAMC copies of any demands, notices, summonses, or legal papers received in connection with any claim, investigation, litigation, or other proceeding related to or in any way connected with your employment by CAMC; (ii) authorize CAMC to obtain records and other information requested by CAMC; (iii) cooperate with CAMC in the investigation, prosecution, defense, or settlement of any claim, litigation, investigation, or proceeding; and (iv) assist CAMC, as requested, in the enforcement of any right against any person or organization which may be liable to CAMC because of injury or damage to which the insurance or self-insurance provided by CAMC may apply.  The terms of this exhibit shall survive the expiration or termination of your employment.

(g)      You understand and agree that CAMC will not be responsible for any liabilities or obligations, whether fixed or contingent, known or unknown, liquidated or unliquidated, now existing or hereafter arising, which result, in whole or in part, from any act or omission which occurred prior to, or otherwise outside the scope of, your employment with CAMC (the "Excluded Liabilities").

(h)      CAMC and you recognize there may be situations where your conduct and the conduct of other CAMC employees who are separately insured or self-insured by CAMC ("Separately Insured Employees") are implicated in allegations of medical professional negligence or other actionable conduct arising from acts or omissions in the course and scope of your employment by CAMC.  Inasmuch as such matters can pose vicarious legal exposure to CAMC and/or harm to its reputation, and recognizing your fiduciary duty to CAMC as your employer, you will require counsel assigned to you by your insurer  in such matters to reasonably cooperate with counsel for CAMC and CAMC will require counsel assigned to it and to its Separately Insured Employees to reasonably cooperate with your counsel by communicating their respective positions, including timely disclosure of the terms and amounts of any proposed settlement, as appropriate and permissible under the Rules of Professional Conduct, including protections provided by the attorney-client privilege.  You and CAMC commit to defending your respective positions on the merits and will refrain from filing crossclaims or third-party complaints against each other without first communicating with counsel for the other as a matter of professional courtesy.

EXHIBIT C – INTELLECTUAL PROPERTY POLICY

As a term and condition of your employment with CAMC, you agree that:

1.      All inventions, ideas, concepts, processes, discoveries, improvements, trademarks, ("Intangible Rights"), whether patentable or unpatentable, which are or were first conceived, made, invented, suggested or discovered by you, alone or in collaboration with others, in the scope of your employment, shall be promptly disclosed to CAMC.   All books, journals, publications and other written materials in any form which are or were conceived, suggested, made, produced, prepared, or generated by you, alone or in collaboration with others, in the scope of your employment, shall be "work made for hire" as defined under the copyright laws of the United States ("Work Made for Hire").  Work Made for Hire shall likewise be promptly disclosed to CAMC.

2.      Intangible Rights and Work Made for Hire shall be the exclusive property of CAMC; provided that, at you request, you shall be included as an author in any Work Made for Hire.  If CAMC determines to patent or register any such Intangible Rights or Work Made for Hire under any federal, state or foreign law, you agree, at the expense of CAMC, to execute all documents and take all actions as are necessary or proper to assign your entire rights in the Intangible Rights or Work Made for Hire to CAMC and to obtain patents and/or registrations on such Intangible Rights or Work Made for Hire which shall be the sole and exclusive property of CAMC.

3.      You further agree, whether or not in the employ of CAMC at the time, and at the expense of CAMC (including reasonable compensation to you if you are no longer employed by CAMC), to cooperate with CAMC in the prosecution or defense of any patent or registration claims or any litigation or proceedings involving Intangible Rights or Work Made for Hire. CAMC shall pay all attorney's fees, court costs and litigation expenses incurred in the prosecution or defense of any such patent or registration claims or in any litigation or proceedings involving Intangible Rights or Work Made for Hire and CAMC shall indemnify you from, and hold you harmless against, any and all liability, claims, causes of action, damages, fines and penalties arising from, or out of, such claims, litigation, or proceedings wherein CAMC owns the Intangible Rights or Work Made for Hire; provided, however, that CAMC shall have no duty to indemnify you with respect to any liability, claim, cause of action, damage, fine or penalty arising out of or resulting from any of your acts or omissions or with respect to any matter as to which you did not give adequate notice to CAMC to allow CAMC to direct and control the prosecution or defense of such matter.

4.      CAMC shall have sole and exclusive discretion over decisions as to whether, how and to what extent to seek evaluation, sale, assignment, registration, protection and enforcement related to any Intangible Rights or Work Made for Hire.  CAMC makes no representations or warranties that it will seek evaluation, sale, assignment, registration, protection or enforcement related to any Intangible Rights or Work Made for Hire.